Henry Yorzinski,          :
    Plaintiff,        :
                :
v.                        :     **Case No. 3:05cv1656 (JBA)**
                :
John Alves, et al.,       :
    Defendants.        :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 22]**

Plaintiff Henry Yorzinski alleges in his Complaint (removed from state court on federal question grounds) violations of 28 U.S.C. § 1983 and Conn. Const. Art. I § 7 for unreasonable search of his house and automobile following his warrantless arrest in the early morning hours of July 3, 2000. Defendants Branford Police Department Officers John Alves, Kris Hormuth, and Peter Kendzierski, Sergeant Mark Ciarciello, and Chief Robert Gill move for summary judgment contending: (1) defendants' search of plaintiff's residence was valid under the protective sweep exception to the Fourth Amendment of the United States Constitution; (2) defendants are entitled to qualified immunity for their actions; (3) plaintiff fails to state a viable claim under Conn. Const. Art. I § 7; and (4) plaintiffs' claims are barred by Heck v. Humphrey, 512 U.S. 477 (1994). Defs. Mot. [Doc. # 22].[1] For the reasons that follow, defendants' Motion

_____

[1] Defendants represent, and plaintiff does not dispute in his opposition memorandum, that plaintiff (via counsel, Attorney Norman Pattis) agreed to withdraw his claims against defendants

will be denied, except as described in note 1, supra.

## I.   Factual Background

The following facts are undisputed except where noted.
As of July 3, 2000, plaintiff resided at 600 Main Street in
Branford, Connecticut, at the intersection of Main, Monroe, and
Kirkham Streets, in an apartment consisting of a downstairs
kitchen, bathroom, and living room, two upstairs bedrooms, and an
attic.  At the time, defendants Alves, Kendzierski, and
Ciarciello were officers in the Branford Police Department.

On July 3, 2000, the Branford Police Department dispatched
officers to the intersection of Main, Monroe, and Kirkham
Streets, near the Short Beach Saloon, in response to a report
that a white male with a beard and scraggly hair, wearing a t-
shirt and shorts, threatened with a handgun two individuals in a
car near the intersection of Main and Kirkham Streets.  At the
time the dispatch went out, defendant Alves was in his police
cruiser at the intersection of Main and Kirkham Streets and
observed an individual (the plaintiff) fitting the description of
the dispatch climbing the stairs to the residence of 600 Main
Street.  To Alves, it appeared that plaintiff was in a hurry, and
Alves shone his spotlight on plaintiff in hopes that plaintiff

Gill and Hormuth, and thus those claims will be dismissed.
Additionally, plaintiff does not identify any evidence to dispute
defendants' contentions that they did not search plaintiff's
automobile, and thus defendants' Motion will be granted as to
plaintiff's claims with respect to any automobile search.

would stop; it appeared to Alves that plaintiff was fumbling with his keys and in a rush to enter the apartment.  Plaintiff testifies that he was afraid Alves might think he was breaking into his own apartment, so he held his keys up so that Alves could see them, and then continued into the apartment.  Shortly thereafter, plaintiff exited the apartment with his dog, at which point Alves and Kendzierski approached him, detained him, and conducted a pat-down.  When asked whether there was anyone else in the apartment, plaintiff answered in the negative.

Around this time, Sergeant Ciarciello arrived on the scene and ordered Alves and Kendzierski to handcuff plaintiff, which they did.  Alves informed Ciarciello of plaintiff's behavior upon shining the spotlight on him, including appearing to be in a hurry and fumbling with his keys, and also informed Ciarciello that plaintiff was exiting the apartment with his dog when the officers detained him.  Ciarciello observed the apartment door, left partially open with the keys still in the lock, saw that the lights in plaintiff's apartment were still on, and concluded that another individual might still be in plaintiff's apartment.  Ciarciello claims that because of the officers' position approximately 7-8 feet below the door to plaintiff's apartment, they could not see around the corner, and due to the size of the apartment building he did not know how much of the building constituted plaintiff's apartment.  As a result of these

circumstances, he feared that the officers were vulnerable to attack by someone inside.  Ciarciello also claims to have been concerned about potential victims inside the residence and, since the dispatch stated that a gun had been pulled on a man and a woman, he believed that it may have involved a "love triangle" and that a victim may be inside plaintiff's residence.

Accordingly, while Alves transported plaintiff down to the police cruiser, Ciarciello and Kendzierski conducted what they contend was a protective search of plaintiff's residence and which they claim lasted 30-60 seconds.  Defendants argue that reasonable suspicion existed to conduct a protective sweep based on the following factors: plaintiff's "evasive" behavior, the fact that plaintiff left the lights on in his apartment with his door partially open and his keys in the door, the fact that the incident reported occurred in close proximity to 600 Main Street, the position of the officers in relation to the door to plaintiff's apartment, the size of the building at 600 Main Street, and concern for potential victims inside.

## II.  Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  A party seeking summary judgment "bears the burden of
establishing that no genuine issue of material fact exists and
that the undisputed facts establish [its] right to judgment as a
matter of law."  Rodriguez v. City of N.Y., 72 F.3d 1051, 1060
(2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144,
157 (1970)).  "The duty of the court is to determine whether
there are issues to be tried; in making that determination, the
court is to draw all factual inferences in favor of the party
against whom summary judgment is sought, viewing the factual
assertions in materials such as affidavits, exhibits, and
depositions in the light most favorable to the party opposing the
motion."  Id. (citations omitted).  "If reasonable minds could
differ as to the import of the evidence . . . and if there is any
evidence in the record from any source from which a reasonable
inference in the nonmoving party's favor may be drawn, the moving
party simply cannot obtain a summary judgment."  R.B. Ventures,
Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal
quotation, citation, and alteration omitted).  However, "[w]here
the record taken as a whole could not lead a rational trier of
fact to find for the non-moving party, there is no genuine issue
for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 586 (1986) (internal quotation and citation
omitted).

In moving for summary judgment against a party who will bear

the ultimate burden of proof at trial, the movant's burden of
establishing that there is no genuine issue of material fact in
dispute will be satisfied if he or she can point to an absence of
evidence to support an essential element of the non-moving
party's claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23
(1986).  "A defendant need not prove a negative when it moves for
summary judgment on an issue that the plaintiff must prove at
trial.  It need only point to an absence of proof on plaintiff's
part, and, at that point, plaintiff must 'designate specific
facts showing that there is a genuine issue for trial.'" Parker
v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001)
(quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential
Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir.
1994) ("[T]he moving party may obtain summary judgment by showing
that little or no evidence may be found in support of the
nonmoving party's case.").  The non-moving party, in order to
defeat summary judgment, must then come forward with evidence
that would be sufficient to support a jury verdict in his or her
favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)
("[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.").  In making this determination, the
Court draws all reasonable inferences in the light most favorable
to the party opposing the motion.  Matsushita, 475 U.S. at 587.

However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. Matsushita, 475 U.S. at 586 (citations omitted).

## III. Discussion

### A.   Protective Sweep

As the parties acknowledge, "[w]arrantless entry into a home is per se unreasonable . . . absent consent or exigent circumstances." See Waananen v. Barry, 343 F. Supp. 2d 161 (D. Conn. 2004) (citing Payton v. New York, 445 U.S. 573, 586 (1980), and Steagald v. United States, 451 U.S. 204, 216 (1981)). However, the Supreme Court in Maryland v. Buie, 494 U.S. 325 (1990), in an analogy to the stop and frisk principles of Terry v. Ohio, 393 U.S. 1 (1968), and Michigan v. Long, 463 U.S. 1032 (1983), held that the Fourth Amendment permits "protective sweeps" undertaken "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing . . . that the area swept harbored an individual posing a danger to the officer or others." Buie, 494 U.S. at 327 (internal quotations omitted). Buie explained:

> A Terry or Long frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A

> protective sweep, in contrast, occurs as an adjunct to
> the serious step of taking a person into custody for
> the purpose of prosecuting him for a crime.  Moreover,
> unlike an encounter on the street or along a highway,
> an in-home arrest puts the officer at the disadvantage
> of being on his adversary's "turf."  An ambush in a
> confined setting of unknown configuration is more to be
> feared than it is in open, more familiar surroundings.

Id. at 333.  Accordingly, the Buie court sanctioned two types of

protective searches: (1) "as an incident to [an] arrest the

officers could, as a precautionary matter and without probable

cause or reasonable suspicion, look in closets and other spaces

immediately adjoining the place of arrest from which an attack

could be immediately launched;" and (2) "[b]eyond that, . . .

there must be articulable facts which, taken together with the

rational inferences from those facts, would warrant a reasonably

prudent officer in believing that the area to be swept harbors an

individual posing a danger to those on the arrest scene."  Id. at

334.  Buie clarified that a protective sweep is "not a full

search of the premises, but may extend only to a cursory

inspection of those spaces where a person may be found [and]

lasts no longer than is necessary to dispel the reasonable

suspicion of danger and in any event no longer than it takes to

complete the arrest and depart the premises."  Id. at 335.

    Post-Buie, circuit courts have extended Buie's holding to

find that the second type of protective sweep allowed by Buie can

include sweeps following arrests that take place just outside of

a suspect's residence, as opposed to inside.  See Sharrar v.

Felsing, 128 F.3d 810, 823-24 (3d Cir. 1997) (citing cases);

United States v. Oguns, 921 F.2d 442, 446 (2d Cir. 1990)

(security sweeps incident to arrest outside of the home

permissible "if the arresting officers had (1) a reasonable

belief that third persons were inside, and (2) a reasonable

belief that the third persons were aware of the arrest outside

the premises so that they might destroy evidence, escape or

jeopardize the safety of the officers or the public") (internal

quotation omitted).  Courts' analyses of whether protective

sweeps are justified thus consider the totality of the

circumstances, focusing "on the quantity and quality of the

articulable facts necessary to justify the sweep."  Sharrar, 128

F.3d at 824.  However, in keeping with the purpose of protective

sweeps, facts concerning the dangerousness of the arrestee him-

or herself "are not appropriate facts to consider when

determining whether the arresting officers reasonably believed

that someone else inside the house might pose a danger to them.

The facts upon which officers may justify a Buie protective sweep

are those facts giving rise to a suspicion of danger from the

attack by a third party during the arrest, not the dangerousness

of the arrested individual."  United States v. Colbert, 76 F.3d

773, 777 (6th Cir. 1996) (emphasis in original).  Moreover,

officers "cannot rely solely on generalizations that suspects are

usually accompanied by dangerous third parties" and "[l]ack of

information cannot provide an articulable basis upon which to justify a protective sweep." <u>United States v. Gandia</u>, 424 F.3d 255, 264 (2d Cir. 2005).

Here defendants justify their protective sweep on: (1) plaintiff's observed "evasive" behavior; (2) that plaintiff left the lights on in his apartment with his door partially open and his keys in the door; (3) that the gun threat incident reported occurred in close proximity to 600 Main Street; (4) the position of the officers in relation to the door to plaintiff's apartment; (5) the size of the building at 600 Main Street and its unknown configuration; and (6) concern for potential victims inside.

Of these, only the nature of plaintiff's behavior appears to be contested, as plaintiff disputes defendants' claim that he acted evasively or fumbled with his keys, claiming that he held his keys up to signal to the officer that it was his apartment. Even accepting defendants' characterization of plaintiff's behavior, however, that characterization does not support a protective sweep of the premises under <u>Buie</u> because while it might have raised suspicions as to plaintiff himself, it does not suggest – at least based on the description of plaintiff's behavior in the current record – that another person was inside plaintiff's apartment. As to the other facts identified by defendants, that plaintiff left his lights on with the door partially open and his keys in the door is consistent with

10

plaintiff having exited his apartment with his dog, and while the open door, the officers proximity to the door, and the unknown configuration of the building may have posed a risk if there were a third person inside plaintiff's apartment, none of these facts support a reasonable suspicion that there was such a person.  See Gandia, 424 F.3d at 264 (facts pointed to by officers such as their knowledge that defendant "had recently emerged from a heated argument," "the police radio call which informed them that [defendant] might have a gun," "the fact that [defendant] stated he did not have a gun prior to being questioned above it," and "the fact that the officers had not recovered the gun during their pat-down frisk of him," even if they supported a "reasonable inference that [defendant] was hiding a gun in the apartment," did not support the inference "that there was a person hiding in the apartment who might use it").  Further, the dispatch report indicated that one person threatened the couple, so there was no reason to suspect that plaintiff had a cohort hidden in his apartment.  Similarly, the "love triangle" theory advanced by the defendants and the claimed fear for the safety of a victim inside the apartment is not reasonable because the dispatch report indicated that two people inside a car had been threatened by a man matching plaintiff's description and there was no report that one of the alleged victims was missing or had been taken by the perpetrator, nor any other information to

suggest that the plaintiff was harboring a victim in his apartment – all of the potentially involved individuals were accounted for.[2]

Additionally, a <u>Buie</u> search must be limited to addressing "the interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has

---

[2] The cases cited by defendants are distinguishable on their facts. <u>See</u>, <u>e.g.</u>, <u>United States v. Martins</u>, 413 F.3d 139, 150-51 (1st Cir. 2005) (reasonable suspicion for protective sweep where shootings that officers were investigating took place within 100 yards of apartment complex, apartment was tied to shootings because one of the victims had retreated there, the police knew from experience that victims in gang-area shootings often were gang members themselves and tended to congregate with other gang members, and the individual who first spoke from behind the closed door was evasive and a different person responded the second time the officer knocked on the door); <u>United States v. Richards</u>, 937 F.2d 1287, 1291 (7th Cir. 1991) (reasonable suspicion for protective sweep where "officers knew that the day prior, [defendant] had been seen with Moore, a suspect in the murder investigation. When [defendant] met them at the door, the officers did not know whether Moore was inside the apartment. Next, [defendant] opened the door with a gun [which] gave the officers a specific and articulable fact regarding [defendant's] apartment: that it harbored at least one and possibly more threatening gun owners, such as murder suspect Moore," the officers also saw cocaine in the living room and defendant "twice failed to answer [the officer's] question about whether anyone else was in the house"); <u>United States v. El-Gheur</u>, No. 91cr328 (LBS), 1991 WL 197559, at *4 (S.D.N.Y. Sept. 24, 1991) (reasonable suspicion for sweep where "[a]fter arresting two individuals in Manhattan and seizing about 500 grams of heroin, the agents were told by one of the individuals that the supplier was at the apartment in Brooklyn waiting for the money and holding additional heroin [and] [w]hile the agents were standing outside the defendant's apartment, the door opened and the defendant started to emerge [and] [a]fter the agents identified themselves as police officers, the defendant appeared 'shocked' and 'startled' and attempted to retreat back into the apartment. After the officers entered the apartment, they found a second individual with the defendant").

just been, arrested is not harboring other persons who are
dangerous and who could unexpectedly launch an attack" and at the
time the officers commenced the search, plaintiff Yorzinski had
already been handcuffed and was being taken away from his
residence to the police car – all of the officers simply could
have left the premises when Alves escorted plaintiff away, thus
avoiding any potential risk. Cf. generally Gandia, 424 F.3d at
263 (acknowledging that "there was no need for the police
officers to enter [defendant's] home in the first place" and that
they "could have avoided the disadvantage of being on
[defendant's] adversary's home turf").

Further, although defendants are correct that the officers
were not required to believe plaintiff when he told them there
was no one else inside the apartment, see Gandia, 424 F.3d at
264, they nevertheless needed some "evidence to the contrary that
would indicate a third person might be hiding there" as "[l]ack
of information cannot provide an articulable basis upon which to
justify a protective sweep," id. (comparing circumstances with
cases where, despite a suspect's denial, noises were heard from
inside the residence suggesting the presence of other
individuals).[3]

_____

[3] Lastly, to the extent that defendants are arguing that the
non-Ciarciello defendants are not liable for the protective sweep
by the contention in their Reply Memorandum that it was
Ciarciello alone that made the decision to order the sweep, it is
well established that officers can be held jointly liable for

Therefore defendants are not entitled to summary judgment on grounds that their search of Yorzinski's apartment was justified under the protective sweep doctrine because the undisputed facts in the record do not support their claimed reasonable belief that a third party was inside the plaintiff's apartment.

B.    Qualified Immunity

Defendants contend that even if they are not entitled to summary judgment on the issue of whether their search of Yorzinski's apartment was constitutional as justified by the protective sweep exception to the warrant requirement, they are entitled to qualified immunity for their actions as the law regarding protective sweeps was not clearly established at the time of the search, July 2000, and that, in any event, their actions were not objectively unreasonable.

"Public officials enjoy qualified immunity from suit for damages under 42 U.S.C. § 1983 for acts undertaken in their official capacity, unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known."  Harhay v. Town of

_____

failing to protect an individual from the violation of his/her constitutional rights by another officer.  See Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 129 (2d Cir. 1997) ("A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers. . . . Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability.").

Ellington Bd. of Educ., 323 F.3d 206, 211 (2d Cir. 2003) (citing

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Second

Circuit's "analysis of a qualified immunity claim consists of a

three step inquiry: . . . First, we must determine whether

plaintiff has alleged a violation of a constitutional right.

Then we consider if the violated right was clearly established at

the time of the conduct. . . . Finally, if plaintiff had a

clearly established, constitutionally protected right that was

violated by the actions of the [defendants], [plaintiff] must

demonstrate that defendants' actions were not objectively

reasonable."  Id.  In order for a right to have been "clearly

established" "[t]he contours of the right must [have been]

sufficiently clear that a reasonable official would understand

that what he is doing violates that right.  That is not to say

that an official action is protected by qualified immunity unless

the very action in question has previously been held unlawful . .

. but it is to say that in the light of preexisting law the

unlawfulness must be apparent."  Anderson v. Creighton, 483 U.S.

635, 640 (1987).  A defendant will be entitled to summary

judgment on qualified immunity grounds when: "no reasonable jury,

looking at the evidence in the light most favorable to, and

drawing all inferences most favorable to, the plaintiffs, could

conclude that it was objectively unreasonable for the defendant

to believe that he was acting in a fashion that did not clearly

15

violate an established federally protected right."  Thomas v.
Roach, 165 F.3d 137, 143 (2d Cir. 1999) (internal quotation
omitted).  Thus, "[s]ummary judgment on qualified immunity
grounds is not appropriate when there are facts in dispute that
are material to a determination of reasonableness."  Id.; accord
Sharrar, 128 F.3d at 828 (not only is the evidence of "clearly
established law" for the court, "but also whether the actions of
the officers were objectively reasonable.  Only if the historical
facts material to the latter issue are in dispute, . . . will
there be an issue for the jury").

Here, defendants do not dispute that plaintiff claims
violation of a constitutional right, that is, the Fourth
Amendment right to be free from unreasonable searches and
seizures.  Defendants argue, however, that the scope of that
right with respect to protective sweeps was not "clearly
established" as of July 2000 as "the protective sweep doctrine
was not defined with reasonable specificity [because] [i]n every
case dealing with the doctrine, the reasonable suspicion inquiry
required the evaluation of the various factors, which led the
officer to believe that a person might be inside a residence
harboring the officer's danger [and] [w]hile there is no
exhaustive list, as of 2000, it was unclear what factors could or
could not have risen to a finding of reasonable suspicion" and
thus the "precise contours" of the doctrine were not clearly

established.  Def. Mem. at 27-28.

"In determining whether a particular right was clearly established at the time defendants acted, [the Second Circuit] has considered three factors: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991).  Defendants cite no case law to support their general claim that as of July 2000 it was not clear what factors could or could not have risen to the required reasonable suspicion for a protective sweep. Moreover, with the exception of Gandia and United States v. Martins, see supra note 2 (cited by defendants), all of the case law cited supra was decided before July 2000.  Indeed, Buie had been decided 10 years earlier and its notion of reasonable articulable suspicion was merely an extension of the same concept used in the Terry stop and frisk analysis, which has been applied by courts and officers since it was decided in 1968.  While defendants claim that the relevancy of various factors had not been definitively determined, that assessment necessarily varies in every case, as the reasonable suspicion analysis is fact- and circumstance-dependent.  Defendants' argument here, if accepted,

would essentially confer qualified immunity in every case of a claimed "protective sweep."  Accordingly, defendants' contention that the contours of the protective sweep doctrine were not precisely defined as of July 2000 fails.

The next consideration is therefore whether defendants' actions were objectively reasonable.  As noted above, if the material facts are undisputed, this is a question for the Court; however, if those facts are disputed, summary judgment should be denied and the issue will go to the jury for determination of the material facts.  "The objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of defendant's actions," taking into account "the facts and circumstances of each particular case . . . and acknowledg[ing] that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving . . ."  Thomas, 165 F.3d at 143; accord Cook v. Sheldon, 41 F.3d 73, 78 (2d Cir. 1994).  On this record the officers' actions have not been shown to be objectively reasonable because, drawing all inferences in favor of the plaintiff, there was no basis to support a belief that a dangerous individual was harbored in the plaintiff's apartment.  The facts regarding the plaintiff's appearance and behavior are disputed, and will thus go to the jury.  Defendant's Summary Judgment Motion on qualified immunity

grounds is denied.

C. Connecticut Constitutional Claim

Defendants also argue that plaintiff's claim for violation of Connecticut Constitution Art. I § 7 must be dismissed as the Connecticut Supreme Court "has been reluctant to create private causes of action for money damages under the Connecticut Constitution," and because "[t]o date, such a cause of action has been created in only one specific set of circumstance[s] with respect to article first, § 7." Def. Mem. at 33.

Defendants misapprehend the import of the Connecticut Supreme Court's holding in Binette v. Sabo, 710 A.2d 688 (Conn. 1998), that a private right of action for money damages existed stemming from alleged violations of the search and seizure (§ 7) and false arrest (§ 9) sections of the Connecticut Constitution. 710 A.2d at 689. While Binette emphasized that its decision did "not mean that a constitutional cause of action exists for every violation of [Connecticut's] state constitution" and that "[w]hether to recognize a cause of action for alleged violations of other state constitutional provisions in the future must be determined on a case-by-case basis," Binette did not, as defendants now suggest, impose a limitation on claims based on claimed police search and seizure violation of § 7. Indeed, similar arguments were rejected by Judge Burns in Gillespie v. Ancona, No. 97cv2045, 1999 WL 66538 (D. Conn. Feb. 4, 1999),

holding that Binette constituted "clear authority" for a "common
law right of action for damages in cases involving unlawful
arrests, and unreasonable searches and seizures by government
officials" pursuant to Connecticut Constitution Art. I §§ 7 and
9, and finding that the plaintiff in question could "bring a
private right of action for damages under [§§ 7 and 9] because
his claims of unlawful arrest and excessive force virtually mimic
the factual predicate underlying the Connecticut Supreme Court's
decision in Binette, while bearing no resemblance to the
situation in Kelley Property."[4]  1999 WL 66538, at *3; see also
Lopez v. Smiley, 375 F. Supp. 2d 19, 23 (D. Conn. 2005) (Kravitz,
J.) (noting, "Binette created a narrow cause of action for money
damages under the Article First, §§ 7 and 9 of the Connecticut
Constitution for illegal searches and seizures of private homes
by police officers, a cause of action that is equivalent to the
federal Bivens action under the Fourth Amendment to the United
States Constitution.").

Defendants' Motion for Summary Judgment as to plaintiff's
Connecticut Constitutional claim is thus also denied.[5]

---

[4] Kelly Property Development, Inc. v. Town of Lebanon, 627
A.2d 909 (Conn. 1993), prohibited a constitutional tort action
against defendant members of a town planning and zoning
commission.  See Gillespie, 1999 WL 66538, at *3.

[5] Defendants also argue that if the Connecticut
Constitutional claim is allowed, qualified immunity applies with
equal force as it does to a § 1983 claim.  Whether this is true
has not yet been decided, see Gilliam v. Town of Windsor Locks,

Lastly, defendants contend that plaintiffs' claims are barred by the rationale of <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), contending that a judgment in favor of plaintiff in this case would "necessarily imply the invalidity of his conviction or sentence," that is, his acceptance of "accelerated rehabilitation" and a requirement that he sell his gun collection, found in the protective sweep of his house.  <u>See</u> Def. Mem. at 38-39.  Defendants argue: "Rather than challenge his criminal charges, on the basis that the protective sweep was illegal and any evidence resulting from it would be excluded, he chose to take accelerated rehabilitation.  This course of action thereby solidified the validity of the protective sweep.  If the court were to allow the plaintiff's present action to proceed, it would call into question the validity [o]f his agreement, thereby calling into question the validity of the protective sweep."  <u>Id</u>. at 39.

---

No. 03cv1201 (AVC), 2006 WL 581208, *7 (D. Conn. Mar. 7, 2006) (rejecting defendants' qualified immunity argument on ground that "there is no Connecticut precedent establishing the same qualified immunity defense available under § 1983 for Connecticut constitutional violations"), but the Court does not need to reach this issue at this stage given its disposition of defendants' qualified immunity argument, <u>supra</u>.  <u>See generally</u> <u>Walczyk v. Rio</u>, 339 F. Supp. 2d 385, 390 (D. Conn. 2004) (Chatigny, J.) (declining to resolve the open issue of whether the cause of action recognized in <u>Binette</u> should be subject to the defense of qualified immunity available to police officers under § 1983 because "even assuming defendants are correct, they are not entitled to qualified immunity as a matter of law").

Heck v. Humphrey directed that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed." Id. at 487. Heck actually addressed a situation such as the one in this case, and found it fell into the latter category, noting "[f]or example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, . . . such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful."[6] Id. at 487 n.7. This is particularly true in this

_____

[6] Heck noted that "[i]n order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury." Id. Plaintiff will of course bear this burden in this case and he has pled such damage, including damage to his personal property and emotional distress.

22

case, where plaintiff accepted accelerated rehabilitation in lieu of contesting the admissibility of the seized evidence, and thus a finding that the protective sweep was unconstitutional would not render plaintiff's conviction invalid because he essentially pleaded guilty to the charge.

**IV. Summary**

Thus, for the foregoing reasons, defendants' Motion for Summary Judgment [Doc. # 22] is GRANTED with respect to any claim relating to a search of plaintiff's car and his claims against defendant officers Gill and Hormuth, and DENIED as to all other claims.

IT IS SO ORDERED.

/s/
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 16th day of February, 2007.**